The Liem v. Attorney General, Mr. Choi. May it please the Court, Sam Choi of Sidley Austin LLP, on behalf of the petitioner, Gunawan Liem, at this time I'd like to reserve three minutes for rebuttal. The issue before the Court this afternoon is whether the Board of Immigration Appeals abused its discretion in denying Mr. Liem's motion to reopen. In the face of evidence in the administrative record, establishing that country conditions in his country of nationality, Indonesia, have markedly changed. In particular, there have been dramatic rises of religious persecution, threats, violence against Chinese Christians in the country, as well as the failure of the Indonesian government to address these issues and to prevent such abuses from occurring. What specific threats and violence directed at Christians were cited in the materials that he filed? Your Honor, the administrative record that Mr. Liem provided to the BIA contained numerous exhibits citing, among other things, the dramatic increases of violence against religious minorities in the period of 2007 to 2014, a 25% increase. The evidence also showed a further 33% increase in religious violence between the years 2014 and 2015. The evidence also showed dangerous and lethal attacks against religious minorities, including Christians, in 2016. These included bombings of churches, attacks on priests, the death of young children as they were leaving Sunday services. And to add on top of that, Your Honor, that in the U.S. Commission's International Religious Freedom Report for 2017 noted that abuses of the freedom of religion and the freedom of belief in Indonesia have continued and intensified over this period of time. And so looking at it in total, the violence against religious minorities and, in particular, Chinese Christians, both the Chinese population as well as the Christian population in Indonesia, has markedly changed. And we submit that it has now become the necessary changed country conditions required under the statutes as well as the implementing regulations for granting Mr. Liem's motion to reopen. All right. But the change needs to be material, right? Yes, Your Honor. How much change in a country is material change? Your Honor, we're not aware- Is that an elusive question that's hard to define? I mean, do we have guideposts to tell us how much change- clearly there's change here, but is it material? And how do we know whether it's material or not? Yes, Your Honor. We are not- there is no hard line rule whether on a quantitative or a qualitative basis saying at this point changes in the country have become material as required under the statute as well as the implementing regulations. However, we would point, Your Honor, to- and with all due respect to the fellow members of the Bar who were just arguing before the Court- we have a situation where there are a sister circuit that has ruled directly on this issue. In particular, the First Circuit's decision- Maybe there is- is there something in that opinion that tells us either quantity and or quality of change that rises to the level of material, or is it we know it when we see it sort of test? The COTAG decision, the First Circuit and the COTAG decision, again, as Your Honor pointed out, doesn't point out a hard line rule of when it has become a material change in conditions. But the First Circuit in the COTAG decision, looking at the totality of the evidence, determined that there was enough there to find or to conclude that there may have been a material change in country circumstances, thereby necessitating a remand and finding that the BIA had abused its discretion. And we would point out, Your Honor, that the same types- similar types of evidence for, among other things, the violence against Christians during the relevant period, issues such as the rise of Islamic extremism, the change- Does it matter what part of the country that occurs? And Indonesia is a big country. And, you know, there are- there's evidence in the record, I think, that there was a Sharia movement in the Banda Aceh area, right? Yes. And I don't recall, was Mr. Liam from that area or not? No, he is not from the Banda Aceh. Does that matter if a big country like Indonesia has a lot of trouble in one area, one province or state, but the petitioner is not from that area, does that make a difference? Your Honor, I guess it could make a difference in certain situations, but what we- But does it make a difference for us or is that just something to be dealt with on remand? You know, we've got a lot of cases that talk about relocation within country, right? Yes. When people are suffering in one area, but there's evidence in the record that the agency will sometimes say, but you can- you'd be fine in a different part of the country. Is that something that- if that's true in this case, that the trouble is predominantly in Banda Aceh and Liam is not from that area, is that something that the agency would take cognizance of on remand or is that something that we should pay attention to at this moment? We would submit that that would be a matter that would be properly before the board to consider. And returning to Your Honor's question about the location of where these incidents are occurring, Your Honor correctly pointed to some of the issues that were arising in the Banda Aceh region, in particular the implementation of Sharia principles and laws. But we submit that the evidentiary record, the administrative record that was before the BIA, showed that the Sharia issues, the Islamic extremism issues, were not localized. In fact, they metastasized. They went across the country. Among other things, the national government, the Indonesian national government, has indicated that it will now implement Sharia principles into the national laws. Where in the record is that? I apologize, Your Honor. I don't have it immediately in front of me, but I'm happy to respond to a rebuttal. Yes. All right. Go ahead. Can I ask a question? You talked about the First Circuit opinion. Wasn't the issue there that the First Circuit or that the BIA had neglected to consider how the evangelical nature of the petitioner was going to impact? And they basically said that the BIA ignored this and so needed to go back and reexamine the situation based upon that. Are you contending here that the BIA ignored certain things in the record, similar to our opinion in Jiang where we said, well, they explained certain things but they didn't touch on other things and they need to go back and look at that again? Is that what you're contending? I guess I'm confused as to precisely your argument. Yes, Your Honor. That's correct that in the Siu Tang decision, the evangelical aspect of that petitioner was certainly a consideration that the First Circuit had in mind when it issued its decision. And are you contending the BIA here ignored certain things in the record? That's correct, Your Honor. Among other things, to turn to the first point that Your Honor pointed out regarding the evangelical point, both in the motion as well as in the evidentiary record, there are indications, clear indications that Mr. Leem, a Seventh-day Adventist, a particularized subset of denomination of evangelical Christianity, would have been targeted because of the Seventh-day Adventist strict observance of, among other things, a Saturday Sabbath as well as the particularized belief of evangelism. But we would also point out, Your Honor. That raised it before the BIA. It was, Your Honor. It was raised both in Mr. Leem's motion as well as the exhibits that exist in the administrative record. But, Your Honor, also returning to your question regarding the Siotang decision, we submit that even though the Siotang decision did look at, among other things, the evangelical aspect of that petitioner, it is evident that the evangelical aspect of Mr. Siotang, in that matter, was in ways a proxy to describe public expressions of Christian faith, where there the evangelicalism is the going out and the spreading of the Christian gospel. And in subsequent decisions, the BIA itself, following Siotang, recognizing the First Circuit's conclusions that the evidentiary record that was in the Siotang matter was sufficient to find that there may have been changed country circumstances, the subsequent decisions from the BIA following Siotang similarly hold and notably do not rely on an evangelical aspect. In fact, they turn to similar facts in the record about increasing violence against Christians and religious minorities generally as well as the rise of Islamic extremism and the threats of persecution that Christians would face in light of those changing circumstances in the country. But those are one-judge rulings, are they not? That's correct, Your Honor. They are one-judge rulings, and it is correct that this Court's precedent has stated that these one-judge rulings of the BIA are not controlling, but we would submit that they are highly persuasive in showing what the BIA considers to be a material change in country circumstances. And so returning to Judge Hardiman's question, the BIA has erred here by failing to consider similar record evidence and directly addressing it in its opinion. And so we submit that a proper consideration of such evidence should be before the BIA to look at the same evidence in light of CO10, in light of the BIA's subsequent decisions, looking at similar issues and finding if there have been materially changed circumstances in the country and granting motions to reopen. Could you help me with the – could you explain the significance of the treatment of the former governor of Jakarta, and how that plays into your argument here? Certainly, Your Honor. The Ahok situation, the former governor of Jakarta, as you pointed out, was arrested, tried, convicted, and sentenced based on the Indonesia's blasphemy laws. And it's notable that Mr. Ahok was tried and convicted on this blasphemy law, not because of something he said to denigrate the Muslim religion or really any religion for that matter, but really it was when he was attempting to bridge a religious divide by encouraging the population, the Muslim population, that they need not be tied to voting only for Muslims, but instead that they could openly, in a democratic country such as Indonesia, vote for Christians. And the response that followed thereafter by the Islamic hardline groups as well as the government's accession to the demands of that hardline group to sentence – strike that – to arrest, try, and sentence, and imprison Mr. Ahok, we submit, shows that the blasphemy laws in Indonesia are now being used in a way they had not been used before, in particular to persecute and to target Christians in a way that had not been – had not previously existed in the country. And we submit also, Your Honor, that the Sio Tang decision expressly took note of the Ahok – of the Ahok case as one – as an indicia of changed country conditions. I see that my time for now has expired, and so I will return on rebuttal as well as addressing the issue about the national complication of Sharia laws. Thank you, Mr. Chou. We'll go to Mr. O'Connell. Good morning, Your Honors. Thank you for having me. Joseph O'Connell on behalf of the Acting Attorney General. Your Honors, the only real issue in this case is whether the board's decision was an abuse of discretion and others – in other words, whether it was arbitrary, irrational, or contrary to law. And the board's decision was none of those things in this case. Well, in Geng, we sent the matter back to the BIA when we felt that the BIA had ignored certain evidence. And we said that the duty to consider all the evidence is especially high when there's an allegation of changed conditions. Looking at the BIA decision here, there's one paragraph that addresses the exhibits and cites seven – doesn't cite – makes statements about the fact that this discrimination and violence continues to exist. That's correct. And it's really nothing but the same old, same old, if you will. But I'm bothered by the fact that several of the exhibits that are cited contain statements showing increased tension and rising discrimination and violence, mainstreaming of extremist positions, anti-Chinese rhetoric, recent years' strong, proud, pluralistic tradition has come under threat. A lot of things that are said in the very documents that are cited here show that it's not just the same old thing. It would show that there are increasing tensions. And then in addition, there are at least eight or ten other exhibits that contain a lot of evidence of the same thing, the creeping Islamization of the country, the coalescing of an Islamic vote, a growing trend of discriminating. A lot of these things are cited in other exhibits that aren't even referenced. So it's a long question, but it's a problem, as I see it, that in Jiang we said, you know, if something is conclusory, they need to go back and look at it. Why should we not send it back to the BIA to consider all of this evidence? So to the extent that the board might have cited it more briefly than this court would have liked, there's also a case law that says the board does not need to parse and refute every single evidence, I mean, no more so than this court does when it denies a petition for review. Here's what's strange about it, as I understand it, what Judge Rendell's getting at is absolutely with many cases, opinions, saying the board, this isn't sort of a gotcha test where the Third Circuit looks to see if the board mentioned every piece of evidence in the record. So I'm with you on that. But what's a little odd about this case is that there were pieces of the record mentioned in support of the board's decision denying relief that have contained in those very exhibits information that's very supportive of Liam's claim. And I don't see the board wrestling with that. And I could go through some of them. I mean, Judge Rendell just mentioned some of them. So can you deal with that? I mean, one of those exhibits indicated 1,000 churches have been closed in the last decade, right? Did the board acknowledge that and wrestle with that and say, well, it's not helpful to Liam because he's from a different part of the country, or those churches closed because they didn't have money, not because of persecution? I mean, to the extent the board cited those exhibits, I would concede that, yes, there's evidence for and against the board's decision and Mr. Liam's case in some of those exhibits. But I would also tie this question to Your Honor's earlier question to Petitioner's Counsel as, is there some sort of quantum of evidence that establishes where there is changed country conditions, or is there a creeping of instances of religious violence or a small rise in religious violence? And I think the answer to that question is that this is a determination that should be made by the board. But that just sounds like an argument for rebid. I disagree with that in this case. Well, they don't acknowledge any creeping at all. They just say it's the same old. It just continues to exist. Tengents have existed since their independence, and they've gone periodically. It's business as usual. They don't acknowledge even any creeping. And we're talking about 2003, are we not? We are. 2003 to 2018. I mean, even if it's creeping, it could have been materially changed conditions. It could, but I would still argue that there's no error in the board's statement that this is a longstanding problem. And even with the creeping issues, if the court actually dives into the record and the numbers that we're talking about, this creeping is so small that I don't think it's actually necessary to even acknowledge it in like a parse and refute type decision. I'll give you an example of that. So the Soterra Institute, which the petitioner cited, they said there was a 33% increase in religious violence from 2014 to 2015. So in terms of actual raw data, that was an increase from 177 incidents to 236 incidents. And this is in a country of 260 million people. Well, that may be what the BIA says on remand when we say look at all these statistics, but it looks like they didn't even consider it. I mean, I'm just looking at the – it says the article report submitted by the respondents showed that discrimination violence continued to exist. Blasphemy laws haven't been repealed. Documents show there's a longstanding problem rather than materially changed conditions. And to my mind, there's a lot of evidence in what has been provided by the petitioner that says this is ratcheting up to a dangerous point. And the BIA – I mean, the BIA could acknowledge it and say, okay, we see that they're saying it's ratcheting up, but we really don't have enough evidence of that. But they don't even acknowledge that. They did not say that – they did not acknowledge it in explicit terms like that. But when the court looks at the actual numbers, like I mentioned, it's infinitesimal. This is a difference between 170 – A thousand churches closed is infinitesimal? A thousand churches closed – I'd like to know why they were closed. In the past decade. If they were closed because they didn't have enough people going or they ran out of money – Again – Those would be relatively innocuous reasons for purposes of this claim. If they were closed because the people were terrified to go to church, then that would seem to really support Liam's claim. I would request that the court just look at the record. And I don't know if there's actual evidence in the record to show why those churches were closed. No, there isn't. This goes back to the petitioner's burden of proof. So the petitioner's burden of proof, and it's a heavy burden to show that conditions in Indonesia have changed to such an extent that he gets to start over. But shouldn't the board examine him on that or his counsel and say, Counsel, I see in the record – I'll tell you what exhibit it is. It's – NN. NN. A thousand churches shut down in the past decade. 516 were closed between 1945 and 1998. I mean, look at the dates, Your Honor. That's in the past decade. Right, as compared to 50 years before. But again, this is over a 10-year time, and there's no evidence in the record to establish why they were closed. Some of them were permit violations. Again, this is the petitioner's burden before the board, and this is his second motion to reopen. He has a heavy burden. All right, but did the agency have to at least reference that and take cognizance of it and give the kind of response you just gave? I mean, I think the adjudicator could have said something like, look, this exhibit, NN, says thousands have changed, but the petitioner has given me no evidence as to why that was so, so I don't put any evidentiary weight upon it. That's absolutely correct, too, Your Honor. So could the board's decision always be more wholesome? Of course. But again, the petitioner's motion to reopen before the board in this case was four pages long, the substantive part of it, four pages long. And so his affidavit was a single page. Yes, he appended 35 country reports. All right, well, that's a different argument, though. That's sort of – so it sounds like what you're saying is to reopen, you need to plead facts. You can't do sort of a document dump over the transom where you just make a bare-bones petition and then attach all kinds of documents. Is that what you're saying? I would actually – I would agree with that. I would agree with that principle. But I would also argue that, you know, the board doesn't have to go into every single instance of religious violence. I agree. I agree with you on that. But here's – I mean, do you deny that PP – I'm going to give you a list of exhibits that, as far as I can tell, were never mentioned by the board. PP, TT, WW, triple A, triple B, triple E, triple J, triple P. Each one of those I just mentioned has within them some evidence that is quite supportive of Liam's claim. I don't know if the adjudicator would find it persuasive or not. There might be holes in it. All I know, sitting here, is the agency didn't even cite any of them. It didn't take cognizance of them. Well, again, like I said, the board does not have to get into every single allocation. And, again, there was a document dump in this instance. And so, like, just for instance, I noticed you said to exhibit TT. There's evidence that goes both ways in that exhibit. But it says rising religious intolerance. Rising religious intolerance. But also, like, Your Honor has to recognize that even the last case in which I can't pronounce I-R-A-O-E-I, which this circuit issued in 2014, this court noted that most of those instances of religious violence were direct against Muslim minority communities. And so, just to go back to exhibit TT, for the first time – it says, for the first time in Parliament, Islamist leader who leads the Islamic Defenders Front, which is responsible for the attacks on religious minorities, he was also charged with defamation and blasphemy. And he was one of the leaders against the campaign against AIHOC. So there's evidence that goes both ways in all of these exhibits. Mr. O'Connell, I'm bothered by the fact that we have an upstanding person, member of his community, ministries. He's a deacon. He ministers in his community. His wife's a deacon, established, has a job. Sets forth evidence showing increasing religious intolerance. And one of these organizations, the F.P.I., you know, the leader 10 years ago was put in jail for bombing – The same leader that was charged with blasphemy, Your Honor. Now they're basically running the country. Your Honor, that's the same leader that I just mentioned that was charged with blasphemy for insulting Christianity. Okay, but – And I would disagree with that characterization that they're running the country. Again, if you look at the actual data, the numbers, the numbers are 177 to 236. All right, let me back up, though. How about we have Sia Teng, which wasn't decided at the time of the BIA. I'd love to get into Sia Teng if I can. Wait a minute. And then we also have these other Christians whose cases have been permitted to be reopened. We're not asking for him to get relief. We're asking him to be able to present his case. Which he did several times now. He did it in 2003. He had an appeal. He did a petition for review. He filed the first motion to reopen in 2007, and he filed a second motion to reopen. So he's been before the agency several times. All right, but do you not accept the possibility that in the last eight years, radicalization has taken hold in a lot of places in the world, and there is evidence of radical Islam and persecution of Christians and Chinese Christians in this record? It's a very broad statement, Your Honor, this radical Islam. But has it taken hold? I would disagree with that. But it's changed. There is a change that was not even acknowledged by the BIA. It's changed to an extent, the quantum of evidence. Okay, but let's get into the materiality question. I wanted to ask you the same question, Mr. Troy. It seems rather elusive. Where would you draw the line of materiality? Like I said, is there a quantum of evidence? Is there a number that I can give you? I can't. But I can tell you that the board, this is a determination that's within the discretion of the board. The board decides this case. Your Honor, the standard of review here is, was the board's determination somehow irrational, arbitrary? It wasn't. All right, but did the board, did the board's, I don't remember the board's opinion to say, there's been plenty of change in Indonesia, but it's not material for these reasons. I read the opinion more to say that same old, same old. I would agree with the latter characterization, but I would also argue that the change was real small, that it is essentially same old, same old. So they did cite to certain articles in the record, and they addressed AHOC. And I'm going to, if I could get back to Sihotong very quickly. So in Sihotong, the First Circuit, in that case, the board incorrectly evaluated, as Your Honor noted, that the petitioner's case was as if he was a prototypical Indonesian Christian. So unlike this case, the petitioner is subscribed to a more particularized subset of Christianity. In that case, proselytizing was a religious obligation for Mr. Sihotong, and the board missed that. So that's what the issue was in that case. So the court noted that, the First Circuit noted, that the contrary conditions of the evidence appear to be uniquely problematic for evangelical Christians. So compare that to this case. So look at, in his opening brief, he says a fundamental aspect of his faith is to spread the gospel. But there's no citation to the record of that. Well, he has a letter from his reverend saying he is a deacon and he ministers in the community. And that says nothing about proselytizing. He tithes $6,700 a year. It says nothing about proselytizing being a religious obligation. Well, but Seventh-day Adventists can be, some people have termed it evangelical. There is no evidence in the record to establish that. There is not a single citation, not a shred of evidence in the record to establish that Seventh-day Adventists are evangelicals and proselytizing is a religious obligation. Look at his affidavit. This is what Mr. Leung's affidavit says, and I'll quote it. It's very short. I have been a member of my church at the First Indonesian Seventh-day Adventist Church in New Jersey for nine years. Full stop. There isn't any evidence that he is a proselytizer. He didn't proffer any evidence that I could see of proselytizing. Nothing. But at the same time, I didn't read the board to say if he had been a proselytizer, maybe he wins, but this guy is not a proselytizer, he loses. That's not. But that would be asking. I think that's a step too far to ask the board to go into a hypothetical to suggest, or to distinguish Sihotong, which hadn't come out yet, and which doesn't apply here in any event, to say something along the lines of if he were a smaller subset or a Muslim minority or something else, then he would be able to establish changed country conditions. This is your basic vanilla Christian Indonesian case. All right. But let's talk about consistency by the agency because you're quite right. Sihotong is not binding in this circuit, et cetera. But did the board not remand a decision from New Jersey recently to look into this very question we're wrestling with here? They appended board decisions at the end of their reply brief. First and foremost, those decisions are clearly outside of the administrative record, and by statute shouldn't be considered. They're not on Westlaw. They are redacted. And so if you look at even notwithstanding that, if you even look at the face of those board decisions, you can tell that they are not the same case. In one of those cases, the petitioner was a convert from Islam to Christianity. That's a particular set of facts. In another case, they indicated they submitted evidence that they had been popularized by newspaper articles. These particular petitioners had been popularized in news articles in Indonesia and that they would make them more vulnerable to attacks in that country. Again, we don't have any of the evidence in those cases. That's why we can't consider any of those cases. That's why we can't consider the outcome of those cases. So there's a difference between an arbitrary board decision where you get generally the same evidence and then you get different outcomes. Arbitrary. And then there's a difference between arbitrary and then particularized, which brings me back to the Sihutong case. That's why Sihutong doesn't apply. That's the same principle of these unpublished and redacted board decisions. Even from the face of the record of these board decisions, you can tell that they're different. And again, we don't have any of the evidence. So the board has to make a particularized determination in every instance. That's what we ask them to do every single time. And then they're all issued by the same board member who issued the same decision in this case. That would suggest that the board member is fully aware of the circumstances and that he made particular determinations in each case. Mr. O'Connell, would you address the relocation issue I took up with Mr. Choi? So in Aceh, Sharia law has been in place since 2001. There was some autonomy granted to it after the tsunami earthquake. So I would note that Aceh is about 1,300 miles away from Surabaya, which is where Mr. Leung is from. The United States government is not asking him to go back to Aceh. He's not from Aceh. He has no requirement to go back there. And I'd also like to address that there was the caning of the Christian. That was one of the worst articles that was in the record. So Sharia law is in place. But that article also states that any convict that violates both national and religious laws, such as the selling of bootleg liquor, which is the case in that case, non-Muslims can choose to be prosecuted under either system. That's what it also says in the country report that the board took administrative notice of. That very article also suggests that the person in that case might have voluntarily chosen the public caning in lieu of accepting a lengthy prison sentence under the national laws. So to answer your question, Your Honor, the Aceh issue goes to the materiality issue, I think. And again, like, we're not asking him to go to Aceh. Not only that, there's evidence to suggest that he wouldn't necessarily be subject to the Sharia law that's in Aceh. He could choose to be subject to the national laws. But doesn't that mean that if we remand it, you have an easy victory on remand for the reason you just articulate? I think there's a victory in this case. I think the case should end on this instance. Again, this is a burden-approved case. Mr. Liam just simply did not- Bernie lost once on a reopen. I mean, this is a second motion to reopen. I was on the panel on the other one. I mean, do we take any- The government, the petition for review was denied in that case. That was also my case. Do we take any cognizance of that, or is that irrelevant? The previous denial? Yeah. The fact that it's- After the previous denial, he was given this sort of administrative grace, temporary stay under the Indonesian surrender, at which point the previous DHS secretary did not choose to remove Mr. Liam at that point, which allowed him to stay and file his second motion to reopen, which we're at now today. But I don't see how it changes anything. I'm confused on the evangelical issue. Okay. It has some relevance because Sia Tang referenced it here. Yes. So is he an evangelical? I mean, has he done- Has he practiced evangelizing, and was this raised before the BIA? Number one, I would just cite- I would refer you to the record I've read, which includes Samath Davids. It says he's a deacon in the church, helps with communion. It says he has a ministry. I don't know what that means exactly because there's no evidence in the record. I would also refer you to the administrative record, which is, again, his affidavit. It's page 75, and it has that one sentence that I quoted to you that says, I'm a member of this church, period. That's all it says. So is he evangelical? I think the answer to that question is we don't really know. There's no evidence in the record. He hasn't established that. And so you go back and you go back to the evangelical, the Sia Tang issue. The issue there was proselytizing was a religious obligation. That's why it was different. Sia Tang would have to go back to Indonesia as a religious obligation, attempt to convert Muslims to Christianity. That was a particular problem in that case, which the board missed. The board didn't miss anything in this case, at least that's what I'm arguing. I don't think they missed anything. They might not have been as fulsome or as thorough as they could have been, but again, like I said, you can always ask for a more thorough agency decision. But again, how much does the board have to get into it? Again, I think the important thing is the board reached the ultimately correct conclusion in this case. Again, look at the numbers, look at the data. 177 to 236 in a country of 260 million people the size of Mexico. And again, if Your Honor would like me to address the Ahok case, I'd be happy to do that too. So Ahok was the governor of Jakarta. He didn't get voted in. He took over for the now president, President Widodo. He's still the same president now, so it was a vacancy. When Ahok's term came up, he ran for re-election. And so on the campaign trail, he told an audience that they were being fooled by certain Muslim religious leaders who were using an interpretation of a Koranic verse against him. What he said was he said the Koranic interpretation suggested that Muslims could not be ruled by non-Muslims, and Ahok said publicly that that was incorrect. So then you get the resulting public outcry, and then there's an indictment. But even after the indictment, Ahok won a majority of votes in the three-way election. He just didn't win enough to avoid a runoff where he eventually lost, and he was ultimately convicted of blasphemy. But the most relevant evidence regarding this entire Ahok case comes from the U.S. Commission on International Religious Freedom. It says that the blasphemy charges against Ahok were politically motivated. In other words, yes, they used Ahok's religion against him, but they did so as a pretext to win an election. So bringing this back to the case at bar, how does Ahok's conviction affect Mr. Liam's case? The answer is it doesn't. Ahok's conviction was politically motivated, and it was one of a handful of actual blasphemy convictions in Indonesia every year. I know I threw numbers at the court before. I'm going to just throw a few more, just to help your eyes don't glaze over. So between 2004 and 2014, this is record evidence, there were 89 blasphemy convictions in Indonesia. That averages out to nine per year. So the most recent evidence says between October 2014 and August 2017, there were approximately two dozen blasphemy convictions. So that also equals out to approximately nine blasphemy convictions per year. Nine convictions in a country of 260 million people, even assuming these are all against Christians, and there's no evidence to suggest that, this is infinitesimal numbers. So does Ahok's conviction affect Mr. Liam's case in any way? It doesn't. So he's just one of a handful of convictions every year. Nine in a country of 260 million. So again, I'm well over my time. Unless your Honor is having any more questions you'd like to ask. Oh, I have one more piece of evidence I'd like to address, if that's okay. So we usually rely on the U.S. government reports as the most reliable evidence. So Mr. Liam cites the 2017 Commission on International Religious Freedoms report, cited at least three times. Every year that commission designates countries of particular concern. That's defined as countries that commit systematic, ongoing, and egregious violations of religious liberty. They also have a tier two, which is generally known as the watch list. So he cites this report several times, but he fails to note the most telling part of that report I'm going to quote. In 2017, the USCIRF placed Indonesia on its tier two, where it has been since 2004. Page 491 of the record. And I think that's probably... I don't know how that helps you so much. Because we're looking at 2003. It's 2004 or 2003. It's a long-standing problem. If you look at the difference between 2004 and 2003, I don't think it hasn't changed. So you would suggest that... Let me just challenge the logic of what you said. That wasn't as compelling as I thought it would be. There are only three tiers, right? There's two tiers, I think. I thought there were three tiers. I don't know if there's a third tier. I don't know. Okay, well... It's not like there are 20 tiers. Exactly. And because there aren't 20 tiers, isn't it the case that you could stay within the same tier but yet still be having changed circumstances occur? I would think it would be more reasonable... It doesn't necessarily follow. It's suggestive. It is suggestive. If you go from one tier to another, that sort of screams out changed circumstances. Right. But it doesn't necessarily follow that if you stay within the same tier, that there weren't changed circumstances. I would argue that it would be more... I would argue that it is more suggestive that they stayed the same. Well, if they've been on tier 2 since 1995, then that's something. But if they've been on tier 2 since 2004, at least they haven't changed since 2003. I don't know because I don't know how broad tier 2 is. Like you said, it's not 20 subdivisions. But anyway, we understand... I mean, that was my big finish. We understand your argument. Unless there's any other questions, Your Honors? Thank you, Mr. O'Connor. Okay. Let's hear Mr. Choi's rebuttal. Thank you, Your Honor. Returning to Judge Hardiman's question about the nationalization of Sharia principles across Indonesia, I would respectfully direct the court to petitioner's reply brief, page 18, and in particular the citation to page 577 of the administrative record, which, and I quote, the country's minister of religious affairs, Luqman Hakim Saifuddin, admits that there is growing support for some elements of Sharia law and says the government is preparing legislation to reflect this. And we submit, Your Honor, that this represents the growing Islamic extremism. If you look at the same page of the administrative record, 577, which shows that 73% of people in a poll supported the introduction of Sharia law nationally and 81% favored the country becoming a caliphate, a far cry from the democracy that it is today. Your Honor, we would also, to address Judge Hardiman's question again about at what point do changes become material? At what point do country conditions change sufficiently for the purposes of determining a motion to reopen? And again, while we submit there is no bright line rule on this, but we submit that it's something akin to I know it when I see it. And here we have the First Circuit in Siu Tang as well as the, among others, the eight BIA decisions that were appended to Petitioner's Reply Brief, showing that both the First Circuit and the BIA, as counsel pointed out. But you've got a problem with the persecution issue, don't you? I mean, I scoured the record and I didn't see anything on persecution here. Excuse me, on proselytization. I mean, isn't Mr. O'Connell right that the linchpin of Siu Tang is that Siu Tang has a religious duty to proselytize and the agency did not take cognizance of that very material fact in that case? You're correct, Your Honor, that the administrative record does not contain the word evangelism. But we submit that the different points that were raised in Petitioner's Reply Brief about the fact that he is a 7th Adventist. His status, though, doesn't talk about his behavior. You know, I mean, is he on the street corner? Is he out knocking on doors? I mean, the record is devoid of that, right? You're correct, Your Honor. The record doesn't contain such evidence, though. We would submit that the court may take notice of his status as a 7th Adventist, as well as the points that Judge Randall pointed out regarding the affidavits about his ministry. But, Your Honor, we submit, however, also that Siu Tang is not limited to proselytization, to evangelism. That is, in ways, a proxy for the public expression of his Christian faith. And we would also point the court to… Isn't that really important, though? Because in some countries that repress religious exercise, it's even… We could maybe use China, for example. If you keep it quiet, they leave you alone. And if you're loud about it, then they persecute you. Isn't that just a fact? Without being personally familiar with the situation in China, that certainly seems logical and plausible. But returning to the Siu Tang… We get a lot of cases out of China, some out of Indonesia, where the facts sometimes turn upon the vocalism or the public nature of the religious practice. And Siu Tang does seem to be different from your client's case in that respect. Your Honor, again, returning the… It certainly does make sense that in certain instances where the vocal and the public expression of the faith can be a determining factor in determining whether there have been materially changed country conditions. But we would respectfully point the court to those points in Siu Tang that appear on pages 51 and 52 of that decision, where the First Circuit has listed out a number of bullet points that we note don't focus exclusively on the evangelical nature and the effects on evangelicals. Instead, it talks about general Christians, not limited to evangelicals. It talks about Muslim extremists preventing Christians from gathering for Easter. Again, not talking about evangelicals specifically. It talks about, again, the same issue that we noted in administrative record, page 577, about the enactment of Sharia principles. It talks about the attacks on Christians in general. Again, not limited or specified to evangelicals, but again, talking about Christians writ large. And we would also respectfully point the court to, again, the BIA decisions appended to petitioners' reply brief. In particular, the opinion that appears at ADD 13 through ADD 15. There, the BIA, in its decision, directly cites the Siu Tang case. But notably, there is no discussion at all about evangelicalism. There is no discussion at all about proselytizing. Instead, what we have here is a general description of country conditions as it affects religious minorities in general. Excuse me, is that the same judge that signed the BIA order here? That is, Your Honor. So you would assume, make the assumption that with Siu Tang being an intervening decision, if that judge had it to do over, he would have been consistent with his other rulings and reopened? Yes, we certainly would hope so, Your Honor. That looking at the same record evidence of the violence, the persecution, the threats, the Islamic extremism that has arisen in the country, that the same board member looking at the same record evidence would conclude, as he has done after Siu Tang, that country conditions have changed and that the motion to reopen should have been granted. And his failure to do so, that we have similar record evidence. One day that the BIA decided that it was not sufficient for a motion to reopen, and then later on deciding that the same information was sufficient for a motion to reopen, we submit constitutes an abuse of discretion, and it's arbitrary and capricious. For those reasons, Your Honor, we ask that the court grant the petition, vacate the opinion, and remand it for further proceedings. All right. Thank you, Mr. Choi. The court, are you pro bono in this case? Yes, Your Honor. All right. The court appreciates volunteering of your time and the firm's time, and the court is most appreciative of the excellent argument by both sides and grateful for your deep knowledge of the matter.